# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF INDIANA
## FORT WAYNE DIVISION

| | | |
|---|---|---|
| KATHY SHANEYFELT, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CAUSE NO. 1:05-CV-00354 |
| | ) | |
| JO ANNE B. BARNHART, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## OPINION AND ORDER

Plaintiff Kathy Shaneyfelt appeals to the district court from a final decision of the

Commissioner of Social Security ("Commissioner") denying Shaneyfelt's application under the

Social Security Act (the "Act") for a period of disability and Disability Insurance Benefits

("DIB").[1] (*See* Docket # 4.)  For the reasons set forth herein, the Commissioner's decision will

be AFFIRMED.

## I.  PROCEDURAL HISTORY

Shaneyfelt was last insured for DIB on June 30, 2001 ("referred to herein as the "DLI"),

which is significant to this appeal. (Tr. 34.)  She applied for DIB on October 16, 2002, after her

DIB insured status had expired, alleging that she became disabled as of July 15, 1995. (Tr. 53-

55, 77.)  The Commissioner denied her application initially and upon reconsideration, and

Shaneyfelt requested an administrative hearing. (Tr. 25, 29-36.)  On October 27, 2004,

Administrative Law Judge (ALJ) Frederick McGrath conducted a hearing at which Shaneyfelt,

---

[1] All parties have consented to the Magistrate Judge. *See* 28 U.S.C. § 636(c).

who was represented by counsel, her husband, and a vocational expert testified. (Tr. 540-77.)

On March 22, 2005, the ALJ rendered an unfavorable decision to Shaneyfelt, concluding that she

was not disabled prior to her DLI because she could perform a significant number of jobs in the

national economy despite the limitations caused by her impairments. (Tr. 13-24.)  The Appeals

Council denied Shaneyfelt's request for review, making the ALJ's decision the final decision of

the Commissioner. (Tr. 4-7, 10-12, 500-39.)

Accordingly, Shaneyfelt filed a complaint with this Court on October 7, 2005, seeking

relief from the Commissioner's final decision. (Docket # 1.)  This appeal became ripe for the

Court's review as of May 31, 2006. (*See* Docket # 16-22.)

## II.  THE PARTIES' POSITIONS

Shaneyfelt claims that the ALJ erred in finding that her testimony of pre-DLI debilitating

limitations was not credible, by failing to explain why the objective medical evidence and

treatment history did not support her testimony and by failing to call in a medical expert to

evaluate her. (Opening Br. of Pl. in Social Security Appeal Pursuant to L.R. 7.3 ("Opening Br.")

at 28-33.)   In addition, Shaneyfelt asserts that her claim should be remanded under the sixth

sentence of Section 405(g) of the Act because she has new evidence: (1) two letters penned to

her attorney by Dr. Steven Behrendsen, her treating rheumotologist, four years after her DLI;

and (2) a mental impairment questionnaire and counseling records submitted by social worker

Brenda Sanders, who began counseling her more than two years after her DLI. (Opening Br. at

22-25, 33-34.)

The Commissioner, however, argues that substantial evidence supports the decision to

deny Shaneyfelt a period of disability.  The Commissioner contends that the ALJ's credibility

determination was supported by substantial evidence and adequately articulated. (Mem. in Supp. of the Commissioner's Decision at 9-13.)  Furthermore, the Commissioner asserts that a remand for consideration of the additional reports of Dr. Behrendsen and Sanders is not warranted, as the additional evidence is not material and Shaneyfelt has failed to show good cause for her delay in producing it. (Mem. in Supp. of the Commissioner's Decision at 14-15.)

### III.  FACTUAL BACKGROUND[2]

### *1. Daily Activities*

At the time of the hearing, Shaneyfelt was forty-seven years old and had the equivalent of a high school education. (Tr. 53, 65.)  While Shaneyfelt held various short-term jobs between 1995 and 2002, including working as a cashier and stocker, a janitorial cleaner, a driver, and a waitress, her only employment that constituted substantial gainful activity was her job as a grain inspector, which she performed from 1989 to 1995. (Tr. 60.)  Shaneyfelt alleged in her DIB application that she became disabled as of July 15, 1995, due to degenerative disc disease, herniated lumbar disc, lumbar radiculopathy, and severe chronic pain. (Tr. 59.)  However, in March 2004, more than two years after her DLI, Shaneyfelt was also diagnosed with systemic lupus erythematosus (SLE).[3] (Tr. 458-59.)

At the hearing, Shaneyfelt was asked to describe her daily activities in 2001.   Shaneyfelt

---

[2] The administrative record in this case is voluminous (577 pages), and the parties' disputes involve only small portions of it.  Therefore, in the interest of brevity, this opinion recounts only the portions of the record necessary to the decision.

[3] SLE is a "chronic, multisystem, inflammatory disorder of probable autoimmune etiology, occurring predominantly in young women.  Common manifestations include arthralgias and arthritis; malar and other skin rashes; pleuritis or pericarditis; renal or CNS involvement; and hematologic cytopenia." *The Merck Manual* 266 (Mark H. Beers, ed., 18th ed. 2006).

stated that her "days were pretty bad," explaining that she "didn't spend a lot of time up and about," but instead was "mostly confined in[] [her] home, down in bed," lying down between four and ten hours of her waking hours each day.[4] (Tr. 555-56.)  She recalled that she "very rarely" went out, only to get medicine or groceries, and if she did she always had someone with her. (Tr. 562.)  She further reported that her children did her housework for her, that she did not cook, and that she hired someone to mow her lawn. (Tr. 562.)  Shaneyfelt stated that she and her husband "very rarely" went out socially, only if she was having a good day.[5] (Tr. 562-63.)

When asked to describe her pain in 2001, Shaneyfelt stated that her "joints and . . . muscles constantly hurt[]" and that she experienced pain in her legs, lower back, neck, arms, hands, and elbows, as well as constant fatigue and migraine headaches. (Tr. 548-49.)  On a ten-point scale, she relayed that her pain was a "nine" at its worst and a "six" at its best, articulating that it felt "like someone [was] putting a knife into [her] joints . . . ." (Tr. 549.)

Shaneyfelt explained that prior to her DLI she had tried various modalities to relieve her pain, including hot baths, a heating pad for four to ten waking hours per day, massages three times a week, sitting in a recliner, icing of her joints, and aqua therapy. (Tr. 549-55.)  She explained that these modalities were effective for approximately twenty minutes at a time, if at all, but that the pain would then return. (Tr. 551.)  Shaneyfelt stated that she did not take

---

[4] At the hearing, Shaneyfelt stated that she currently lives with her husband, whom she married in 2000, and twenty-month-old grandchild, whom she and her husband obtained custody of in 2003. (Tr. 544-45.)  Shaneyfelt explained that her husband is the primary caregiver of the baby during the day, and when he goes to work at night, her daughters and a girlfriend take turns coming over to care for the child. (Tr. 563-66.)  Shaneyfelt confided that she is the primary caregiver of the child between approximately 10:00 p.m. and 4:00 a.m. (Tr. 565.)

[5] Curiously, in contrast to her testimony of days spent lying in bed at home prior to her DLI, Shaneyfelt's DIB application shows that she sought out and performed the following part-time jobs during the relevant time period: waitress for one month in 1995; cashier and stocker from November 1995 through March 1996 and for three days in 2002; transportation driver from 1997 through May 1999; and janitorial cleaner for three months in 1998 and for one month in 2001. (Tr. 60.)

medication to relieve her pain in 2001, explaining that she did not have medical insurance at the time so she did not visit a physician.[6] (Tr. 554, 560.)

From a physical capacity standpoint, Shaneyfelt stated that in 2001 she could stand uninterrupted for twenty to thirty minutes, could sit uninterrupted for fifteen to twenty minutes, and could walk only around her house, confiding that she "wasn't very mobile." (Tr. 556.) She reported that the heaviest thing she could lift and carry was a gallon of milk. (Tr. 556.) She also stated that her arms and hands had "a tendency to constantly go numb," stiffen, and swell, which caused her to frequently drop items and affected her ability to reach with her arms most of the day for five out of seven days each week. (Tr. 557-58.) On the days when she experienced these symptoms, Shaneyfelt stated that she needed help to perform her self care, such as fastening buttons and zippers. (Tr. 558-59.) Shaneyfelt also reported that she was frequently forgetful and had trouble concentrating on tasks because of her pain and fatigue. (Tr. 560.)

## 2. Relevant Medical History

On January 31, 1995, Shaneyfelt visited Dr. James Dozier, a neurosurgeon, complaining of a one-year history of neck and right arm pain. (Tr. 144-45.) An MRI demonstrated canal stenosis and osteophytic impingement at C5-6, more to the left side, and a suggestion of a disc at right C6-7, which Dr. Dozier believed to be reflective of a C6 and C7 radiculopathy. (Tr. 144-45.) He then ordered a myelogram, which indicated a right C6-7 herniated nucleus pulposus and degenerative spurring on the left at C5-6 causing lateral recess and neural foraminal stenosis.

---

[6] Curiously, this statement by Shaneyfelt conflicts with the records of Dr. Brian Zurcher, her family practitioner, who documented that Shaneyfelt visited him nine times in 1999, called once and visited once in 2000, and phoned once and visited once prior to her DLI in 2001. (Tr. 316-27.) He prescribed, reviewed, or adjusted medications at most of her visits in 1999 and during each of the phone calls and visits in 2000 and 2001. (Tr. 316-27.)

(Tr. 151.)

On August 18, 1995, Shaneyfelt visited Dr. Mark Reecer, a specialist in physical medicine and rehabilitation, complaining of diffuse low back pain that radiated into her right hip and leg, bilateral leg numbness, neck pain, right shoulder and arm pain, bilateral hand numbness and tingling, bilateral arm weakness, and headaches. (Tr. 160.)  Upon physical examination, Dr. Reecer noted that Shaneyfelt had difficulty getting on and off the examination table due to pain; had markedly limited cervical and lumbar range of motion due to pain; had significant tenderness to palpation along the cervical, thoracic, and lumbar paraspinals; and had deceased response to light touch in her right hand and fingers. (Tr. 160-61.)  He diagnosed her with herniation of the cervical spine at C5-6 level with associated stenosis, together with right posterior disc protrusion at the C6-7 level and diffuse myofascial tenderness involving the cervical and lumbar musculature. (Tr. 161.)  Dr. Reecer opined that Shaneyfelt's diffuse back pain was not definitively explained by her disc herniation of the cervical spine; therefore, he recommended that she obtain an orthopaedic consult and undergo further testing to rule out a possible connective tissue disorder. (Tr. 161.)

On October 5, 1995, Shaneyfelt visited Dr. Alan McGee, an orthopaedic surgeon. (Tr. 155.)  Upon physical examination, Dr. McGee noted her cervical range of motion was normal; her neurological examination was normal; her right shoulder was tender in the anterior subacromial space, with pain upon abduction and external rotation; her back examination was unremarkable; her hip examination revealed severe tenderness over the right greater trochanter, but rotation was normal; and x-rays of her hip and shoulder were normal. (Tr. 155.)  He assessed that Shaneyfelt had subacromial and trochanteric bursitis and that no surgery was warranted; he

then injected her right shoulder, referred her to physical therapy, and recommended she that follow up with Dr. Reecer. (Tr. 155.)

On October 16, 1995, Shaneyfelt again visited Dr. Reecer. (Tr. 154.) He reviewed the results of Dr. McGee's consultation and concluded that Shaneyfelt was "dealing primarily with a non surgical problem . . . [of] soft tissue in origin." (Tr. 154.) He noted that Shaneyfelt had been through a comprehensive conservative program, including instruction in proper body mechanics and a home exercise program. (Tr. 154.) He then released Shaneyfelt to return to work the next day without restrictions, opining that "she should be able to tolerate her job duties," and encouraged her to continue her home exercise program. (Tr. 154.)

On March 8, 1996, Shaneyfelt visited Dr. Brian Zurcher, her family practitioner, for a Medicaid eligibility examination, complaining that her pain symptoms were getting progressively worse. (Tr. 327.) She explained that she lost a tremendous amount of strength and could not even open a jar, that it would take her all day to clean her house leaving her exhausted for a whole week afterwards, and that she could not sustain a part-time job. (Tr. 327.) On physical examination, Dr. Zurcher observed that Shaneyfelt appeared exhausted and pale, that it was an effort for her to move about the room, that she needed help to get up from a reclining position, and that a straight leg raising test was positive. (Tr. 327.) Shaneyfelt expressed her fear to him that she might have lupus; Dr. Zurcher stated that he wanted to perform additional testing, as well as investigate other possibilities such as multiple sclerosis and chronic fatigue. (Tr. 327.)

However, Shaneyfelt did not return to see Dr. Zurcher until May 17, 1999, over three

years later.[7]  At this visit, Shaneyfelt was seen for follow up care after sustaining multiple

injuries the prior week in a motor vehicle accident in which the other driver ran a stop sign.[8] (Tr.

327.)  Shaneyfelt visited Dr. Zurcher twelve more times between May 1999 and August 2001 for

follow up care from the accident, an annual examination, and fluid in her ears. (Tr. 316-27.)

However, the possibility of SLE or additional testing for a connective tissue disorder was not

noted by Dr. Zurcher during any of these visits. (Tr. 316-27.)

On October 6, 1999, Shaneyfelt visited Dr. Steven Cremer of Fort Wayne Orthopaedics,

complaining of multiple pains in her low back, hips, right shoulder, and right knee, together with

headaches and hand problems. (Tr. 248.)  She told Dr. Cremer that "overall she was without

these problems prior to a motor vehicle accident which occurred on 05-11-99 . . . . [and that]

"[m]ost of the pain began to occur a few days after the accident." (Tr. 248.)  She rated her pain at

its best as a "six" or "seven," and at its worst as an "eight" or "nine." (Tr. 248-50.)  On physical

examination, Dr. Cremer noted crepitus in Shaneyfelt's right shoulder, but normal muscle

strength in all extremities; decreased sensation in her right L5 distribution, but otherwise normal

sensation; gluteal pain upon palpation; limited cervical range of motion in flexion and rotation;

and multiple trigger points throughout the cervical paraspinals, thoracic paraspinals, and trapezii.

(Tr. 248-50.)  Dr. Cremer's impression was that Shaneyfelt had a lumbar strain/sprain with L5

---

[7] On March 12, 1997, Shaneyfelt visited the emergency room at Lutheran Hospital, complaining that she had been ill for a long time with multiple pains, including right shoulder pain. (Tr. 201-02.)  She expressed concern to the emergency room physician that she feared she might have lupus, but that her family physician would not see her because she was not working. (Tr. 201.)  The emergency room physician concluded that she had multiple chronic complaints that were not appropriate for diagnosis or treatment in an emergency room, gave her medication for pain, and instructed her to contact her family physician, which Shaneyfelt apparently never did. (Tr. 201-02.)

[8] As a result of the accident, Shaneyfelt experienced stiffness and abrasions, but no broken bones, spending one night at Adams County Hospital. (Tr. 203-04.)

disc, myofascial pain, and a sacroiliac strain. (Tr. 249-50.)  He referred her for an MRI and physical therapy, recommended she try injections, and prescribed Elavil and Vioxx. (Tr. 249-50.)    Two weeks later, Shaneyfelt returned to Dr. Cremer, reporting that she was "sore" and still had a headache, that her attendance at physical therapy had been variable due to transportation problems, and that she had quit taking the Elavil and Vioxx because she did not feel good taking them. (Tr. 245.)  An MRI of the cervical spine indicated degenerative neural foraminal stenosis on the right at C5-6 and C6-7, with a possible degree of spondylosis at C6-7. (Tr. 245.)  Dr. Cremer added cervical radiculopathy to Shaneyfelt's diagnoses, referred her for more physical therapy, and prescribed Ambien as a sleep aide and Arthrotec as an anti-inflammatory. (Tr. 245.)

After attending five physical therapy sessions, Shaneyfelt's physical therapy was terminated on November 4, 1999, as her "progress [was] inhibited by pain." (Tr. 281.)

On November 5, 1999, Shaneyfelt returned to Dr. Cremer, who referred her for an epidural of her low back, discussed chiropractic treatment, and prescribed Darvocet for pain. (Tr. 243.)  Shaneyfelt underwent three epidural steroid injections one week later. (Tr. 218-19.)

On December 1, 1999, Shaneyfelt again visited Dr. Cremer, reporting that the epidural blocks had reduced her back pain by fifty percent and almost completely resolved her leg pain. (Tr. 240.)  At this visit, Shaneyfelt primarily complained about headaches and right arm pain. (Tr. 240.)  Upon physical examination, Dr. Cremer noted that her reflexes were decreased in her right triceps, her motor strength was diminished in her right finger extensors, and her sensation was decreased in the C5-6 and C6-7 distributions on the right hand. (Tr. 240.)  He diagnosed her with C5-6 central disc and C6-7 disc herniation with interforaminal encroachment on the right

and lumbar discogenic pain, which improved after injection. (Tr. 240.) He opined that selective blocks in the cervical spine may be necessary and that a surgical consultation was in order. (Tr. 240.)

On December 23, 1999, Shaneyfelt visited Dr. Robert Shugart, an orthopaedic surgeon, for a surgical consultation. (Tr. 236-37.) He diagnosed her with cervical radiculopathy and ordered an EMG to confirm his diagnosis, indicating that a cervical discectomy should be considered to resolve her pain. (Tr. 236-37.) He instructed Shaneyfelt to pursue activities as her pain allowed and assigned her "[n]o restrictions" with respect to her work status. (Tr. 236-37.) Two weeks later, Dr. Shugart recommended that she undergo an anterior cervical decompression and fusion, plating, and allograft at C5-6 and C6-7. (Tr. 232, 236-37.) The surgery was scheduled, but later cancelled due to Shaneyfelt's lack of insurance and financial status.[9] (Tr. 230-31.)

Eighteen months later, on October 14, 2002, Shaneyfelt visited Dr. James Fleck, a neurologist at Indiana University Medical Center, regarding her complaints of chronic pain, which she characterized as increasing in intensity since her motor vehicle accident in 1999. (Tr. 346-48.) On physical examination, Shaneyfelt was tender in the lumbosacral area bilaterally; a straight leg raising test indicated back pain and some tightness in her left hamstring, but no radiation into her right leg or significant radicular symptoms; and her right leg had a bit of weakness in the right hip flexor and right ankle dorsiflexion, together with some pain. (Tr. 346-48.) Dr. Fleck opined overall that she had fairly normal muscle tone and bulk in her extremities

---

[9] Two and a half years later, on July 23, 2002, Shaneyfelt returned to Dr. Shugart and requested that he perform the surgery previously discussed. (Tr. 226.)

and no significant weakness in her upper extremities. (Tr. 346-48.)  After examining her EMG and MRI, he found no clinical evidence of a significant myelopathy or cervical or lumbar radiculopathy and concluded it was possible that much of her pain was musculoskeletal in nature. (Tr. 346-48.)  He further opined that her mood and probably mild depression contributed to her chronic pain syndrome and that it was reasonable for her to consult a psychiatrist. (Tr. 348.)

Almost a year later, on September 2, 2003, Shaneyfelt was evaluated by Dr. Steven Behrendsen, a rheumatologist, for her chronic pain, blaming its onset on a series of accidents, including two motor vehicle accidents and stepping in a hole, which resulted in a fractured ankle. (Tr. 374-76.)  She explained that she had severe pain the last three years, twenty-four hours a day, seven days a week. (Tr. 374-76.)  On physical examination, Dr. Behrendsen noted that Shaneyfelt was a "chronically ill-appearing" individual with dystrophic changes on her left toenails and a diffuse tenderness of her abdomen. (Tr. 374-76.)  She also displayed tenderness at every level of her thoracic and lumbar spine, but no limitation in motion; her cervical spine was moderately painful with any attempt at active range of motion, but displayed only minimal restriction in actual motion. (Tr. 374-76.)  She exhibited positive myofascial tender points, painful shoulders, and tender wrists and fingers, as well as pain in her hips and knees upon motion. (Tr. 374-76.)  Dr. Behrendsen diagnosed her with polyarthralgias of unclear etiology, severe fibromyalgia, and cervical and lumbar degenerative disc disease, and recommended a further work-up for autoimmune rheumatic disease. (Tr. 374-76.)

On November 25, 2003, Shaneyfelt visited social worker Brenda Sanders at the suggestion of her attorney, stating that she had been previously diagnosed with multipersonality

disorder and that sometimes she hears voices.[10] (Tr. 490-95.)  She explained that she had been experiencing emotional and mental symptoms, as well as physical pain, for the last nine years, but had "always chickened out" when it came to seeking out mental health services. (Tr. 490-95.)  Sanders noted that Shaneyfelt's appearance and behavior was appropriate; that she had minimal insight and judgment; that her mood and affect was depressed and flat; that her speech and thinking form were normal, but her thought content was fearful, helpless, religious, hopeless, and worthless; and that she tended to isolate herself from peers and family. (Tr. 490-95.) Sanders's diagnostic impression was an early onset dysthymic disorder, pain disorder associated with both psychological factors and a general medical condition, rule out post traumatic disorder, and rule out personality disorder. (Tr. 495.)  Sanders's report was later reviewed by a psychiatrist, who certified Shaneyfelt's need for continued psychological care. (Tr. 495.)

On December 10, 2003, Shaneyfelt was evaluated by Dr. Houshmand Rezvani, a psychiatrist, reporting that she had been experiencing depression, "nerves," and insomnia for about six years. (Tr. 497-99.)  Dr. Rezvani noted that Shaneyfelt "appears almost healthy and appropriate for her stated age," that her affect was depressed, and that she had a decrease in psychomotor activity; however, otherwise he noted her mental status examination was normal. (Tr. 497-99.)  He diagnosed her with dysthymic disorder that was primary or secondary to her medical illnesses and assigned her a GAF score of forty-five.[11] (Tr. 497-99.)

_____

[10] Approximately fifteen years earlier, Shaneyfelt was admitted to Adams County Hospital due to anxiety attacks and suicidal feelings. (Tr. 117-129.)  The evaluating psychologist noted that Shaneyfelt was over reporting psychopathology, but that her profile was suggestive of a pre-psychotic state or a major affective disorder. (Tr. 117.) The record does not reflect that Shaneyfelt received any mental health services between this hospitalization in 1988 and her visit to Sanders in 2003.

[11] Global Assessment of Functioning (GAF) is a clinician's judgment of an individual's overall level of psychological, social, and occupational functioning on a hypothetical continuum of mental health illness; the GAF

On March 17, 2004, Shaneyfelt returned to Dr. Behrendsen, complaining that her joint pains were increasing. (Tr. 458-59.) She described both her pain and fatigue as a level "ten." (Tr. 458-59.) On physical examination, she displayed moderate synovial thickening and tenderness at her wrists; swollen finger joints; and pain in her shoulders, hips, knees and ankles. (Tr. 458-59.) He adjusted her medications and assigned a diagnosis of SLE with a flare up of polyarthritis and secondary fibromyalgia. (Tr. 458-59.)

On May 11, 2004, Shaneyfelt again visited Dr. Behrendsen, rating her pain as an "eight" and her fatigue as a "nine." (Tr. 453-54.) He affirmed his SLE and fibromyalgia diagnoses and adjusted her medications, noting that her improvement was "modest and slow." (Tr. 453-54.)

### 3. The ALJ's Decision

On March 22, 2005, the ALJ rendered his opinion. (Tr. 16-24.) He found at step one of the five-step analysis that Shaneyfelt had not engaged in substantial gainful activity since her alleged onset date, and at step two that prior to her DLI she had severe impairments with respect to her cervical and lumbar degenerative disc disease. (Tr. 17-18, 23.) However, at step three, he determined that Shaneyfelt's impairments were not severe enough to meet a listing. (Tr. 18, 23.) Before proceeding to step four, the ALJ determined that Shaneyfelt had the following RFC:

> The claimant has the residual functional capacity to perform less than the full range of light work. She can lift and carry 20 pounds occasionally, and 10 pounds frequently, sit for about six hours during an eight-hour workday, and stand and/or walk for about six hours during a workday. She is limited to simple, routine, repetitive tasks, with no production rate pace, but rather goal-oriented work. She can be around other employees throughout the workday, but only have occasional conversations and interpersonal interaction with them.

excludes any physical or environmental limitations. *See* American Psychiatric Ass'n, *Diagnostic and Statistical Manual of Mental Disorders* 34 (4th ed. 2000). A GAF score of forty-five means an individual is experiencing serious symptoms or has a serious impairment in social, occupational, or school functioning. *Id.*

(Tr. 23.)  Based on this RFC, the ALJ concluded at step four that Shaneyfelt could not perform her past relevant work as a grain inspector and that she had no transferable skills. (Tr. 21, 23.) The ALJ proceeded to step five where he determined that, considering her age, education and work experience, Shaneyfelt could perform a significant range of light work jobs available in the national economy, including a parking lot attendant, mail sorter, fast food worker, wire prep worker, and wire worker. (Tr. 22-24.)  Therefore, Shaneyfelt's claim for DIB was denied. (Tr. 22-24.)

## IV.  STANDARD OF REVIEW

Section 405(g) of the Act grants this Court "the power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the [Commissioner], with or without remanding the case for a rehearing." 42 U.S.C. § 405(g).  The ALJ's decision must be sustained if it is supported by substantial evidence. *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000).

Substantial evidence means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.*  The decision will be reversed only if it is not supported by substantial evidence or if the ALJ applied an erroneous legal standard. *Id.*

Under this standard, the Court reviews the entire administrative record, but does not reweigh the evidence, resolve conflicts, decide questions of credibility, or substitute its judgment for the Commissioner's. *Id.*  Nonetheless, "substantial evidence" review should not be a simple rubber-stamp of the Commissioner's decision. *Id.*

## V.  THE LAW

To be considered disabled under the Social Security Act, a claimant must establish that

she is "[unable] to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to . . . last for a continuous period of not less than 12 months." 42 U.S.C. § 416(i)(1); 42 U.S.C. § 423(d)(1)(A). The impairment must be severe, causing the claimant to be unable to do her previous work, or any other substantial gainful activity which exists in the national economy. 42 U.S.C. § 423(d)(2); 20 C.F.R. §§ 405.1505-1511.

The Commissioner evaluates disability claims pursuant to a five-step evaluation process, requiring consideration of the following issues, in sequence: (1) whether the claimant is unemployed; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals one of the impairments listed by the Commissioner, *see* 20 C.F.R. § 404, Subpt. P, App. 1; (4) whether the claimant is unable to perform her past work; and (5) whether the claimant is incapable of performing work in the national economy.[12] 20 C.F.R. § 404.1520; *see also Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001). An affirmative answer leads either to the next step or, on steps three and five, to a finding that the claimant is disabled. *Zalewski v. Heckler*, 760 F.2d 160, 162 n.2 (7th Cir. 1985). A negative answer at any point other than step three stops the inquiry and leads to a finding that the claimant is not disabled. *Id.* The burden of proof lies with the claimant on every step except the fifth, where it shifts to the Commissioner. *Clifford*, 227 F.3d at 868.

## VI. ANALYSIS

### A. The ALJ Did Not Err in Discounting the Credibility of Shaneyfelt's Testimony

---

[12] Before performing steps four and five, the ALJ must determine the claimant's residual functional capacity ("RFC"), or what tasks the claimant can do despite her limitations. 20 C.F.R §§ 404.1520(e), 404.1545(a). The RFC is then used during steps four and five to help determine what, if any, employment the claimant is capable of. 20 C.F.R. § 404.1520(e).

15

Shaneyfelt contends that the ALJ's determination of her credibility was not supported by substantial evidence. Specifically, she asserts that the ALJ erred by (1) failing to adequately explain his reasoning for the determination, to build an accurate and logical bridge between the evidence and his result, and (2) failing to call in a medical expert to evaluate her. Shaneyfelt's arguments, however, fall short; accordingly, the ALJ's credibility determination will not be disturbed.

1. The ALJ Built an Adequate Bridge Between the
Evidence and His Credibility Determination

Because the ALJ is in the best position to evaluate the credibility of a witness, his determination is entitled to special deference. *Powers v. Apfel*, 207 F.3d 431, 435 (7th Cir. 2000). If an ALJ's determination is grounded in the record and articulates his analysis of the evidence "at least at a minimum level," *Ray v. Bowen*, 843 F.2d 998, 1002 (7th Cir. 1988); *see Ottman v. Barnhart*, 306 F. Supp. 2d 829, 838 (N.D. Ind. 2004), creating "an accurate and logical bridge between the evidence and the result," *Shramek v. Apfel*, 226 F.3d 809, 811 (7th Cir. 2000), his determination will be upheld unless it is "patently wrong." *Powers*, 207 F.3d at 435; *see also Carradine v. Barnhart*, 360 F.3d 751, 754 (7th Cir. 2004) (remanding an ALJ's credibility determination because the ALJ's decision was based on "serious errors in reasoning rather than merely the demeanor of the witness").

In his opinion, the ALJ began by chronologically summarizing in detail the medical evidence in the record for the period of 1995 through 2004. (Tr. 18-19.) After reviewing this evidence, the ALJ concluded that Shaneyfelt's testimony of her pre-DLI physical limitations was "greatly exaggerated," explaining that it was "not supported by the objective medical evidence of

record or her treatment history during the period from July 15, 1995, through June 30, 2001, her date last insured." (Tr. 20.) While the ALJ acknowledged that the pre-DLI evidence of Shaneyfelt's cervical and lumbar spine abnormalities would have indeed caused "some degree of exertional limitations," he pointed out that the record "contains no opinions from acceptable medical sources regarding [Shaneyfelt's] limitations during the time period at issue," nor any "evidence that [she] was totally unable to work as she alleges." (Tr. 20.) The ALJ emphasized that it was not until more than two years *after* her DLI that Dr. Behrendsen first evaluated Shaneyfelt, ultimately diagnosing her with SLE. (Tr. 20.) He explained that the SLE diagnosis was ultimately not pivotal, opining that even if she had been diagnosed with SLE prior to her DLI, "the lack of evidence regarding limitations would still exist, and [his] finding would be unchanged." (Tr. 20.)

Contrary to Shaneyfelt's assertion, the ALJ adequately built a bridge between the evidence and his credibility determination. The ALJ presented a "thorough and complete picture of the evidence," *see Zalewski*, 760 F.2d at 166-67, which showed that during the relevant period Shaneyfelt was evaluated and treated for her pain complaints by numerous physicians, who, based on their objective medical testing (including x-rays, myelograms, MRIs, and EMGs), diagnosed her with various spinal conditions, including degenerative disc disease, herniated disc, and lumbar radiculopathy. None of these physicians, however, assigned her any physical limitations or suggested that her complaints were disabling. In fact, quite the opposite occurred, as she was released to return to work without restrictions by Dr. Reecer in 1995 (Tr. 154), by Dr. Shugart in 1999 (Tr. 237), by Dr. Zurcher in 1999 (Tr. 325), by Dr. Cremer in 2000 (Tr. 235), and again by Dr. Zurcher in 2001 (Tr. 318). *See Sienkiewicz v. Barnhart*, 409 F.3d 798, 803-04

(7th Cir. 2005) (discounting claimant's allegations of severe pain when they were inconsistent with the limitations assigned by physicians); *Smith v. Apfel*, 231 F.3d 433, 439 (7th Cir. 2000) ("[A]n ALJ may consider the lack of medical evidence as probative of the claimant's credibility"); SSR 96-7p.

Furthermore, Shaneyfelt's pre-DLI treatment history contains significant periods of time when she sought no medical treatment at all and apparently took no medication for pain. (*See, e.g.*, Tr. 554.) For example, in 1995 Dr. Reecer observed that her spinal pain was diffuse and recommended that she undergo additional testing for a possible connective tissue disorder; however, no follow up took place after this visit. Similarly, in 1996 Shaneyfelt expressed a concern of SLE to Dr. Zurcher, who also recommended that additional testing be performed. However, she did not return to him until three years later for follow up care of injuries sustained in a motor vehicle accident; the possibility of SLE or testing for a connective tissue disorder was never once mentioned during her thirteen visits with Dr. Zurcher between May 1999 and August 2001. (*See* Tr. 316-27.) Shaneyfelt explains away her pre-DLI sporadic treatment history by stating that she had no medical insurance at the time (Tr. 560); nonetheless, the ALJ is entitled to consider this history, taking Shaneyfelt's explanation into consideration, when making his credibility determination.[13] *See* 20 C.F.R. § 404.1529; *Sienkiewicz*, 409 F.3d at 803-

_____

[13] Moreover, earlier in his opinion the ALJ cited other specific evidence that supports his credibility finding. *See generally Edwards v. Sullivan*, 985 F.2d 334, 338 (7th Cir. 1993) ("[I]t is generally understood that a reviewing court does not reconsider credibility determinations made by the ALJ so long as they find some support in the record."). When summarizing Shaneyfelt's treatment history, the ALJ noted that in 1999 Shaneyfelt was prescribed pain medication by Dr. Cremer, but she stopped taking it three days later because of concerns regarding side effects. (Tr. 19.) This does little to support her testimony of disabling pain. *See Luna*, 22 F.3d at 691. Also, in the context of analyzing whether Shaneyfelt had engaged in substantial gainful activity, the ALJ acknowledged that "[a]fter the date of alleged onset of disability, [Shaneyfelt] worked for short periods at several jobs, including driver for the Amish, cleaner, cashier, and waitress." (Tr. 17.) The level of physical activity required to seek out and perform these types of jobs, even for a short period of time, sharply contrasts with the picture that Shaneyfelt painted of her pre-DLI daily routine, in which she very rarely left her home and spent four to ten of her waking hours lying

04; *Smith*, 231 F.3d at 440; *Luna v. Shalala*, 22 F.3d 687, 691 (7th Cir. 1994) (considering claimant's failure to seek medical treatment and use of only sporadic pain medication when discounting claimant's complaints of severe pain); SSR 96-7p.

In light of the foregoing, the ALJ has at least at a minimal level built an accurate and logical bridge between the evidence and his conclusion. Accordingly, his credibility determination, which is entitled to special deference, will not be overturned on this basis.

### 2. The ALJ Did Not Err in Determining Shaneyfelt's Credibility Without Calling in an Additional Medical Expert

Shaneyfelt next contends that the ALJ erred in making his credibility determination without calling in a medical expert to evaluate Shaneyfelt, because there was "evidence of pre-DLI lupus" in the record. (Opening Br. at 30.) As with her first argument, Shaneyfelt's second basis to overturn the ALJ's credibility determination is also unsuccessful.

A claimant has the initial duty to bring forth evidence supporting a finding of disability, 20 C.F.R. § 404.1512(a); *Scheck v. Barnhart*, 357 F.3d 697, 702 (7th Cir. 2004), and when a claimant is represented by counsel at the administrative hearing, the ALJ is entitled to presume that the claimant has advanced her best grounds for recovery, *Sears v. Bowen*, 840 F.2d 394, 402 (7th Cir. 1988). The ALJ has the discretion then to determine whether the evidence put forth by the claimant is adequate to decide the issue of disability or whether further consideration by a medical expert is required. *Skarbek v. Barnhart*, 390 F.3d 500, 504 (7th Cir. 2004) (citing 20 C.F.R. § 404.1527(f)(2)(iii)); *see also* 20 C.F.R. § 404.1512(f). "[B]ecause it is always possible to identify one more test or examination an ALJ might have sought, the ALJ's reasoned

---

on a heating pad. (Tr. 550-51, 556, 562); *see generally Luna*, 22 F.3d at 691 (considering claimant's daily activities when discounting her complaint's of severe pain).

judgment of how much evidence to gather should generally be respected." *Flener v. Barnhart*, 361 F.3d 442, 448 (7th Cir. 2004).

Here, the ALJ did not err in making his credibility determination without seeking the opinion of an additional medical expert. Shaneyfelt was represented by counsel at the hearing and was thus presumed by the ALJ to have advanced her best case. *See Sears*, 840 F.2d at 402. The record contains medical evidence submitted by numerous physicians who evaluated Shaneyfult during the relevant period – Dr. Dozier and Dr. Fleck, both neurologists; Dr. McGee, Dr. Cremer, and Dr. Shugart, all orthopaedists; Dr. Reecer, a specialist in physical medicine and rehabilitation; and Dr. Zurcher, a family practitioner – none of whom assigned her physical limitations or opined that she was disabled. Rather, as discussed *supra*, Dr. Reecer, Dr. Shugart, Dr. Cremer, and Dr. Zurcher all released her to return to work without restrictions during the pre-DLI period.

Moreover, while Dr. Reecer in 1995 and Dr. Zurcher in 1996 recommended that Shaneyfelt undergo additional testing for a possible connective tissue disorder, neither physician thought it necessary to refer her to a specialist, and the testing they recommended was never completed, apparently because Shaneyfelt did not have medical insurance at the time. Curiously though, in contrast to the SLE concern that she expressed to Dr. Zurcher in 1996 and to an emergency room physician in 1997, Shaneyfelt several years later represented to Dr. Zurcher, Dr. Cremer, and Dr. Behrendsen that her symptoms were largely attributable to a 1999 motor vehicle accident. (*See* Tr. 248, 316-27, 374.) It was not until more than two years *after* her DLI that Shaneyfelt was evaluated by Dr. Behrendsen and diagnosed with SLE. *See Estok v. Apfel*, 152 F.3d 636, 640 (7th Cir. 1998) ("It is not enough to show that she had received a diagnosis of

fibromyalgia with a date of onset prior to the expiration of the insured period, since fibromyalgia is not always (indeed, not usually) disabling."); *Anderson v. Sullivan*, 925 F.2d 220, 222 (7th Cir. 1991) (acknowledging that evidence of the claimant's condition after his DLI is relevant, but not determinative, when contemporaneous medical evidence indicates that the claimant was not disabled prior to his DLI); *Kavicky v. Callahan*, No. 96-C-4205, 1998 WL 155923, at *9 (N.D. Ill. March 30, 1998).

Therefore, based on this record, Shaneyfelt's assertion that the ALJ abused his discretion by "ignor[ing] evidence of pre-DLI lupus" in the record, (Opening Br. at 30), and not obtaining an additional medical expert opinion is unsuccessful. The ALJ apparently determined that the evidence before him was adequate to determine the credibility of Shaneyfelt's complaints of debilitating limitations during the pre-DLI period and, in light of the record presented, he did not abuse his discretion by doing so. Accordingly, the ALJ's credibility determination will not be overturned on this basis.

### B. A Remand for Consideration of Additional Evidence is Not Warranted

Shaneyfelt next requests that the Court remand this matter to the Commissioner pursuant to the sixth sentence of 42 U.S.C. § 405(g) for consideration of evidence submitted after the ALJ issued his determination: two letters penned by Dr. Behrendsen to Shaneyfelt's attorney, and a mental impairment questionnaire and counseling records, dated December 2003 to July 2005, completed by Shaneyfelt's social worker. Despite Shaneyfelt's assertion to the contrary, however, a remand is not indicated on this basis.

The sixth sentence of 42 U.S.C. § 405(g) permits a remand "only upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate

such evidence into the record in a prior proceeding."  For sixth sentence purposes, "'materiality' means that there is a 'reasonable probability' that the Commissioner would have reached a different conclusion had the evidence been considered, and 'new' means evidence not in existence or available to the claimant at the time of the administrative proceeding." *Perkins v. Chater*, 107 F.3d 1290, 1296 (7th Cir. 1997); *see also Sample v. Shalala*, 999 F.2d 1138, 1144 (7th Cir. 1993).

1.  The Letters Penned by Dr. Behrendsen to Shaneyfelt's
Attorney Do Not Provide the Basis for a Remand

The first evidence that Shaneyfelt contends is new and material are two letters penned by Dr. Behrendsen to Shaneyfelt's attorney dated June 16, 2005, and July 20, 2005, respectively. (Tr. 503-05.)  In the first letter, Dr. Behrendsen recounted Shaneyfelt's evaluation results and course of treatment, ultimately opining that Shaneyfelt's symptoms are "completely disabling." (Tr. 505.)  His second letter clarified that "it is most likely that [Shaneyfelt] had systemic lupus for many years predating June 30, 2001," based upon her oral report to him of a ten-year history of symptoms. (Tr. 503.)

However, contrary to Shaneyfelt's assertion, Dr. Behrendsen's letters do not constitute "new" evidence.  Rather, his letters primarily summarize the evaluation and treatment information contained in his progress notes that were already included in the record. (*See* Tr. 355-489.)  Likewise, his opinion that Shaneyfelt "most likely" had SLE for many years prior to her DLI and that her symptoms are "completely disabling" was derived from medical evidence already in the record, rather than new clinical findings. *Compare Sears*, 840 F.2d at 399 (finding that a psychological evaluation performed after the ALJ's decision was new evidence as "it was not in existence at the time of the administrative proceedings"), *with Sampl*e, 999 F.2d at 1144

(emphasizing that a physician's report derived from medical evidence already in the record did not constitute new information); *see also Perkins*, 107 F.3d at 1296; *Harris v. Barnhart*, No. 03 C 3185, 2005 WL 1655202, at \*15 (N.D. Ill. April 26, 2005) ("Evidence is new if it is not merely cumulative.").

Furthermore, Dr. Behrendsen's letters are not material. Dr. Behrendsen's opinion is based upon Shaneyfelt's characterization of her symptoms during the relevant period, not actual knowledge, as Dr. Behrendsen did not first evaluate Shaneyfelt until more than two years after her DLI. *See Rice v. Barnhart*, 384 F.3d 363, 371 (7th Cir. 2004) ("[M]edical opinions upon which an ALJ should rely need to be based on objective observations and not amount merely to a recitation of a claimant's subjective complaints."); *see generally Schmidt v. Barnhart*, 395 F.3d 737, 742 (7th Cir. 2005) (determining that a medical opinion documenting claimant's condition one to three years after the ALJ rendered his decision did not constitute new and material evidence). Regardless, the ALJ stated in his opinion that the timing of Shaneyfelt's diagnosis was not pivotal, articulating that "[e]ven if she did have SLE before her date last insured, the lack of evidence regarding limitations would still exist, and the [ALJ]'s finding would be unchanged." (Tr. 20); *see generally Estok*, 152 F.3d at 640. As a result, there is not a reasonable probability that the ALJ would have reached a different conclusion if Dr. Behrendsen's letters were considered, and thus they are not material.

Moreover, assuming *arguendo* that the additional evidence was material, Shaneyfelt fails to show good cause why the evidence was not produced during the pendency of the proceedings. Shaneyfelt was evaluated by Dr. Behrendsen on June 20, 2003, and he assigned her the diagnosis of SLE on March 17, 2004; the ALJ's opinion was not rendered until March 22, 2005. Thus,

Shaneyfelt had *twelve months* to request Dr. Behrendsen's opinion about the onset of her SLE and physical limitations, yet did not do so. Clearly her failure to timely seek out and include this additional opinion from Dr. Behrendsen does not now constitute good cause, as "such a rule would amount to automatic permission to supplement records with new evidence after the ALJ issues a decision in the case, which would seriously undermine the regularity of the administrative process." *Perkins*, 107 F.3d at 1296; *see also Sample*, 999 F.2d at 1144; *Keys v. Barnhart*, No. 01 C 8334, 2002 WL 31369793, at *8-9 (N.D. Ill. Oct. 21, 2002); *Romanoski v. Sullivan*, No. 91 C 8113, 1992 WL 346417, at *8 (N.D. Ill. Nov. 19, 1992) (failing to find good cause where claimant waited until after the ALJ's opinion was rendered to seek out a psychological evaluation, offering no explanation for his delay).

Therefore, Shaneyfelt fails to establish that Dr. Behrendsen's letters constitute new and material evidence and that there was good cause for her failure to incorporate them into the record before the ALJ rendered his opinion. Accordingly, her request for a sixth sentence remand to consider the letters will be denied.

### 2. The Mental Impairment Questionnaire and Counseling Records Submitted by Shaneyfelt's Social Worker Do Not Provide the Basis for a Remand

Shaneyfelt also contends that the mental impairment questionnaire and counseling records submitted by social worker Brenda Sanders, who began counseling her more than two years after her DLI, constitute new and material evidence. (Tr. 509-39.) However, like Dr. Behrendsen's letters, Sanders's records fail to establish a basis for a sixth sentence remand.

Here, Sanders's mental impairment questionnaire and counseling records may, in part, constitute new evidence since some of the information arose from counseling sessions completed after the ALJ rendered his decision. *See Perkins*, 107 F.3d at 1296; *Sears*, 840 F.2d at 399.

24

Regardless, the information is not material. Sanders did not begin counseling Shaneyfelt until more than two years after her DLI and thus did not have actual knowledge of her pre-DLI mental status. *See Rice*, 384 F.3d at 371; *Schmidt*, 395 F.3d at 742. In fact, Sanders declined to answer four of the seven questions on the questionnaire, emphasizing *five times* in her one-and-a-half page response that she did not meet Shaneyfelt until November 23, 2003, and that what answers she did provide "can only be based on assumptions given [Shaneyfelt's] history."[14] (Tr. 538-39.) Therefore, there is not a reasonable probability that the ALJ would have reached a different conclusion had Sanders's records been considered. Accordingly, Shaneyfelt fails to satisfy the materiality requirement.

Moreover, assuming *arguendo* that the additional evidence was material, Shaneyfelt fails to show good cause why the evidence was not produced during the pendency of the proceedings. Shaneyfelt began regular counseling sessions with Sanders in December 2003, and the ALJ's opinion was not rendered until March 22, 2005. Thus, Shaneyfelt had *fifteen months* to request Sanders's opinion of her mental health status prior to her DLI, yet did not do so. As discussed *supra* with respect to Dr. Behrendsen's letters, Shaneyfelt's failure to timely seek out and include Sanders's records and questionnaire in the record does not now constitute good cause. *See Perkins*, 107 F.3d at 1296; *see also Sample*, 999 F.2d at 1144; *Keys*, 2002 WL 31369793, at *8-9; *Romanoski*, 1992 WL 346417, at *8.

Accordingly, Shaneyfelt's request for a sixth sentence remand to consider Sanders's mental impairment questionnaire and counseling records will be denied.

---

[14] Furthermore, the only other history of mental health treatment for Shaneyfelt dates back to 1988, and a social worker is not considered an "acceptable medical source," *see* 20 C.F.R. § 404.1502, 1513(a); *Koschnitzke v. Barnhart*, 293 F. Supp. 2d 943, 950 (E.D. Wis. 2003), and thus her opinion is entitled to less weight.

## VII.  CONCLUSION

As discussed herein, the ALJ's decision to discount Shaneyfelt's testimony of debilitating limitations prior to her DLI is supported by substantial evidence.  Furthermore, a sixth sentence remand to consider new evidence is not indicated, as the additional evidence is not material and no good cause exists for Shaneyfelt's delay in producing it.  Therefore, the decision of the Commissioner is AFFIRMED.  The Clerk is directed to enter a judgment in favor of the Commissioner and against Shaneyfelt.  SO ORDERED.

Enter for this 30th day of June, 2006.

S/Roger B. Cosbey
Roger B. Cosbey,
United States Magistrate Judge